IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Borough of Emmaus,            :
           Petitioner         :
                                   :    No. 1847 C.D. 2014
           v.                     :
                                   :    Argued: June 8, 2016
Pennsylvania Labor Relations     :
Board,                             :
           Respondent      :


BEFORE:    HONORABLE MARY HANNAH LEAVITT, President Judge
                HONORABLE RENÉE COHN JUBELIRER, Judge
                HONORABLE ROBERT SIMPSON, Judge
                HONORABLE P. KEVIN BROBSON, Judge
                HONORABLE PATRICIA A. McCULLOUGH, Judge
                HONORABLE ANNE E. COVEY, Judge
                HONORABLE MICHAEL H. WOJCIK, Judge


OPINION BY
JUDGE McCULLOUGH                          FILED: March 13, 2017


The Borough of Emmaus (Borough) petitions for review from the September 16, 2014 final order of the Pennsylvania Labor Relations Board (Board), which dismissed the Borough's exceptions to the hearing examiner's June 3, 2014 order certifying the Pennsylvania Professional Fire Fighters Association (Association) as the exclusive representative of all full-time and regular part-time firefighters of the Borough's Fire Department (Fire Department) under the act commonly referred to as Act 111.[1]

---

[1] Act of June 24, 1968, P.L. 237, *as amended*, 43 P.S. §§217.1-217.10. Act 111 applies only to police and fire personnel. Section 1 of Act 111, 43 P.S. §217.1.

In this case, the Fire Department was previously considered – or at least believed – to be a "volunteer" fire department that operated independent of the Borough. However, the Borough's Council passed an ordinance that paid its firefighters an hourly wage and structured the Fire Department in such a manner that the firefighters were placed under the authoritative and direct control of the Borough Council and/or its supervisory agents. As a result of these measures, the firefighters instituted proceedings under Act 111, and the Board concluded that an employer-employee relationship existed between the Fire Department and the Borough; therefore, the firefighters were authorized by statute to unionize, and, with the Association's representation, engage in collective bargaining with the Borough. Discerning neither error nor abuse of discretion in the Board's decision, we will affirm.

**Background**

On October 24, 2013, the Association filed a petition seeking to represent a unit of full-time and regular part-time firefighters employed by the Borough. At a hearing before a Board hearing examiner on January 9, 2014, the parties stipulated that the only issue to be decided "is whether the petitioned-for fire fighters are employed by the Borough." (Board's Findings of Fact (F.F.) at No. 3.)[2] The hearing examiner made the following findings of fact.

The Borough is a public employer and a political subdivision pursuant to Act 111 and the Pennsylvania Labor Relations Act (PLRA).[3] The Fire Department is

---

[2] The Board adopted and incorporated the hearing examiner's Findings of Fact Numbers 1 through 30. (*See* Board's Order, 5/1/14; Board's Final Order, 9/16/14.)

[3] Act of June 1, 1937, P.L. 1168, *as amended*, 43 P.S. §§211.1-211.13.

a non-profit corporation incorporated by the Borough. The Borough owns the Fire Department building, most of the Fire Department equipment, and the firefighters' training facility. (F.F. at Nos. 1, 5, 8.)

In 1999, the Borough adopted Ordinance No. 887 (Ordinance) "to effectuate the 'Establishment of the Fire Department . . . comprised of vehicles, equipment, and volunteers from the pre-existing Fire Department of the Borough . . . and any additional equipment or manpower which may be specified by Borough Council.'" (F.F. at Nos. 5-6 (quoting Ordinance).) The Ordinance also established various officer positions, including Fire Chief, Assistant Fire Chief, Deputy Fire Chief, Captain, Lieutenant, and Engineer. The Ordinance states that the Borough Council shall appoint those officers, who "'shall serve as at-will employees and appointees.'" (F.F. at 6 (quoting Ordinance).) The Borough retained the right to adopt rules, regulations, and standard operating procedures, which are binding on the Fire Department and its firefighters; however, the Fire Chief has the right to issue standing orders and a Standard Operating Procedure Manual to direct firefighting activities. The Ordinance also "designates the Borough Council as the entity which sets salaries and compensation for [the] firefighters, after consideration of any recommendation which the Fire Chief may provide." (F.F. at No. 7.)

The Fire Department does not pay for its operations, equipment, or personnel because the Borough directly pays for those items from its Fire Department budget. The Fire Department obtains fuel for fire trucks and equipment directly from the Borough garage at no cost. The Borough's budget contained "38 line items for the Fire Department, totaling $513,016 in actual expenditures in 2012 and a 2013 budgeted amount of $448,158." (F.F. at No. 11.) Pursuant to Borough regulations, no one at the Fire Department, including the Fire Chief, is authorized to make

3

expenditures greater than $500.00 without first obtaining the Borough's permission. (F.F. at Nos. 10-11.)

The Fire Department is managed by two Borough employees, the Fire Chief and the Borough Secretary. The Borough Secretary "runs the day-to-day operations, including the scheduling of fire fighters on a monthly calendar" and also exercises discretion in assigning firefighters to specific shifts. (F.F. at 12.) The firefighters perform various activities during their assigned shifts, such as responding to fire calls, maintaining the fire station, and training. When the firefighters arrive at work, they are required to punch in and out with a time-card system so that the Borough Secretary may track their hours. When a firefighter is unable to work a scheduled shift, he or she must find a replacement. During their scheduled shifts, the firefighters are not permitted to leave the fire station to conduct personal errands. Based on the firefighters' timesheets, the Borough issues monthly paychecks directly to the firefighters and withholds taxes from their paychecks. The firefighters also receive W-2 tax forms from the Borough at the end of each year. The firefighters are paid an hourly rate and may receive overtime if it is authorized by the Fire Chief or Assistant Fire Chief. If overtime is not authorized, a firefighter must punch out and continue to work his or her shift as a volunteer without pay. In 2012, the wage rate for the firefighters ranged from $10.00 per hour to $15.00 per hour. The Borough Council "has the power to set and approve the hourly rates." (F.F. at Nos. 13-15, 18.)

A person interested in becoming a firefighter for the Fire Department must complete an application, which is reviewed by the Fire Chief but "then must be approved by the Borough." (F.F. at No. 20.) "The Borough Council regularly reviews the [Fire] Chief's recommendations for the hiring of fire fighters." (*Id.*) Although the Fire Chief is responsible for disciplining firefighters, the Borough has

4

the final say over disciplinary matters. A firefighter who is unhappy with the Fire Chief's disciplinary decision "may appeal the decision to the Borough Manager." (F.F. at No. 21.) In one instance, the Fire Chief terminated a firefighter; however, the termination letter directed the firefighter to the Borough Manager regarding questions about the discipline, and the Borough Manager attended the firefighter's termination meeting. The Borough Manager has the power to discipline members of the Fire Department for violating the Borough policies. (F.F. at No. 22.)

In 2011, all firefighters received the Borough's Personnel Policy, which "is a compilation of Borough policies ranging from hiring to drug and alcohol to personnel files, signed by the Borough Council President." (F.F. at No. 23.) The Personnel Policy also states that it "does not alter the 'at-will presumption of employment.'" (*Id.* (quoting Personnel Policy).) All firefighters were required to sign a form acknowledging receipt of the policy and return it to the Borough Manager. The firefighters also received the Borough's Non-Union Employees Light-Duty Policy and were required to provide a form acknowledging its receipt to the Borough Manager. (F.F. at No. 24.) In December 2013, the Borough issued the firefighters a memorandum with their paychecks regarding the local services tax; the memorandum stated that it was directed to all "[Part-Time] Employees." (F.F. at No. 25.)

The Fire Department's Standard Operating Guidelines (Guidelines) "defer to and rely on the personnel policies and regulations set forth by the Borough." (F.F. at No. 26.) For example, the Guidelines allow the Borough to perform background checks on all firefighters. The officers of the Fire Department are required to submit annual budget requests to the Fire Chief and the Borough Secretary, who then provide the requests to the Borough Council. Although the

5

Borough Council tries to give deference to the requests, it often rejects them due to "deficits and other safety concerns." (F.F. at Nos. 26, 28.)

The Fire Chief "is in charge at a fire and gives directives to the individual fire fighters in their daily operations." (F.F. at No. 30.) The Fire Chief has disciplined firefighters for various offenses, including insubordination. The Fire Chief terminated a firefighter in February 2011, without obtaining approval from anyone, and also suspended a firefighter in October 2011. (F.F. at No. 29.)

By order dated April 11, 2014, the hearing examiner determined that the firefighters are employees of the Borough, rather than volunteers, because they receive an hourly wage in exchange for their services. Because the Borough exercises control over the firefighters and has the ultimate say over disciplinary and hiring matters, the hearing examiner also determined that an employment relationship exists between the Borough and the firefighters under Act 111. Thereafter, on June 3, 2014, the hearing examiner issued an order certifying the Association as the exclusive representative of all full-time and regular part-time firefighters of the Fire Department.

On June 23, 2014, the Borough filed exceptions to the June 3, 2014 order, arguing that some of the hearing examiner's factual findings were not supported by substantial evidence and the hearing examiner erred in concluding that the firefighters are the Borough's employees. The Board agreed with the hearing examiner that the firefighters are Borough employees under Act 111 and, therefore, dismissed the Borough's exceptions. The Borough now appeals from that decision.[4]

---

[4] Our review of the Board's order is limited to determining whether constitutional rights were violated, whether the Board committed an error of law, or whether the Board's findings are supported by substantial evidence. *Wilkes-Barre Township v. Pennsylvania Labor Relations Board*, 878 A.2d 977, 982 n.13 (Pa. Cmwlth. 2005).

6

## Discussion

On appeal, the Borough asserts that the Board erred in concluding that the firefighters are Borough employees rather than volunteers and that the Board's factual findings are unsupported by substantial evidence.

Section 1 of Act 111 provides:

> Policemen or firemen *employed* by a political subdivision of the Commonwealth or by the Commonwealth shall, through labor organizations or other representatives designated by fifty percent or more of such policemen or firemen, have the right to bargain collectively with their public employers concerning the terms and conditions of their employment, including compensation, hours, working conditions, retirement, pensions and other benefits, and shall have the right to an adjustment or settlement of their grievances or disputes in accordance with the terms of this act.

43 P.S. §217.1 (emphasis added).

Preliminarily, we note that neither Act 111 nor the PLRA defines the term "volunteer." However, the customary legal definition of "volunteer" is "[a] person who gives his services *without any express or implied promise of remuneration*." BLACK'S LAW DICTIONARY 1576 (6th ed. 1990) (emphasis added). In this case, it is undisputed that the Borough pays the firefighters hourly wages in exchange for their services, at rates between $10.00 per hour to $15.00 per hour, and that the Borough pays the firefighters for all of the hours that they work, excluding overtime. (F.F. at No. 17.) The payment of compensation, particularly financial compensation based upon the number of hours worked, is the hallmark of "employee" status in the labor relations context. *See, e.g.*, *Seattle Opera v. National Labor Relations Board*, 292 F.3d 757, 762 (D.C. Cir. 2002) (stating that an employee

7

is any person who works for another for financial or other compensation).[5]  At the very least, the payment of hourly wages is sufficient to take a worker out of the realm of being a "volunteer" (unless a statute says otherwise) and/or militates toward a finding that an employment relationship exists.  *See Juino v. Livingston Parish Fire District*, 717 F.3d 431, 437 (5th Cir. 2013) (observing that courts "have held that a volunteer was not an 'employee' when there was no showing of remuneration."); *Krause v. Cherry Hill Fire District 13*, 969 F. Supp. 270, 277 (D.N.J. 1997) (concluding that firefighters were not volunteers "[i]n view of the fact that the [firefighters] both expected and received hourly compensation . . . .").  Because the payment of hourly-based wages takes the firefighters outside the realm of the definitional concept of volunteers, the dispositive issue, then, is whether the firefighters, in light of the circumstances of this case, are "employees" of the Borough.

"The determination of the employment status is a matter of fact in each case and must be determined by the peculiar circumstances of the individual situation." *Rodgers v. Washington County Institution District*, 37 A.2d 610, 611 (Pa. 1944).  In *Sweet v. Pennsylvania Labor Relations Board*, 322 A.2d 362 (Pa. 1974), the Pennsylvania Supreme Court set forth the following test for determining whether an employer-employee relationship exists:  whether the putative employer has (1) the right to select the employee; (2) the power to discharge the employee; and (3) the right to direct the work to be done and the manner in which the work is done.  *Id.* at 365; *see also International Association of Fire Fighters, Local 2844, AFL-CIO, CLC*

---

[5] Due to similarities between the National Labor Relations Act (NLRA), 29 U.S.C. §§151-169, and the PLRA, "in the context of interpreting our Commonwealth's labor laws, our [courts have] not hesitated to consider, and to follow, federal interpretation of the NLRA."  *Office of Administration v. Pennsylvania Labor Relations Board*, 916 A.2d 541, 550 (Pa. 2007).

*v. Pennsylvania Labor Relations Board*, 504 A.2d 422, 424 (Pa. Cmwlth. 1986) (*en banc*) (stating that *Sweet* "require[s] an examination into who possesses the right to control the economic and conditional terms of employment"). The *Sweet* Court further stated that "[t]he duty to pay an employe's salary is often coincident with the status of employer, but not solely determinative of that status." 322 A.2d at 365. Following *Sweet*, in *Coleman v. Board of Education of the School District of Philadelphia*, 383 A.2d 1275 (Pa. 1978), the Pennsylvania Supreme Court explained that "[t]he [*Sweet*] test is thus framed in terms of the *right* and *power* to exercise such control, not in terms of whether the right and power were *actually* exercised or whether they were delegated to another." *Id.* at 1279 (emphasis in original).

Here, the Board found that: the Ordinance established the Fire Department and reserved to the Borough the right to establish rules, regulations, and procedures for the Fire Department; the Borough owns all of the Fire Department's equipment and buildings; the Borough controls and pays for the Fire Department's budget and expenditures; the Fire Department is run by the Fire Chief and the Borough Secretary, both of whom are Borough employees; and the firefighters are required to punch in and out of work and must remain at the fire station during their shifts. (F.F. at Nos. 6-8, 10-11, 13-14.) With regard to wages, the Board found that: the Borough pays the firefighters hourly wages and withholds taxes from their paychecks; the Borough Council sets and approves the firefighters' hourly pay rates; the firefighters may work overtime if it is approved by the Fire Chief, a Borough employee; and if overtime is not approved, the firefighters must punch out and work as volunteers without pay. (F.F. at Nos. 15-18.) Critically, the Borough did not file exceptions to any of these factual findings, so they are conclusive on appeal. *See* 34

9

Pa. Code §95.98(a)(3) (stating that exceptions not specifically raised before the Board are waived).

Upon examination, we conclude that these factual findings stand in diametric contrast to the findings in *International Association of Fire Fighters, Local 2844, AFL-CIO, CLC*. In that case, this Court concluded that a township did not exercise control over the important conditions of the employment relationship and, therefore, was not the "employer" of a volunteer fire company. Specifically, the findings of fact in *International Association of Fire Fighters, Local 2844, AFL-CIO, CLC* demonstrated that the volunteer fire company – not the township – established its own internal house rules, owned its equipment and fire house, determined the wages, benefits, and hours of the firefighters, and had its own president, board of directors, and fire chief. The polar opposite situation is present here, where the Borough has undertaken the task of governing and dictating all the terms and conditions of the working relationship that the volunteer firefighters decided for themselves and on their own accord in *International Association of Fire Fighters, Local 2844, AFL-CIO, CLC*. Therefore, we conclude that the above unchallenged findings sustain the Board's determination that the Borough exercises control over the firefighters' wages, hours, and working conditions.

Further, this Court has stated that "[t]he employer's power to control the nature and the parameters of the employee's activities is the key to the relationship." *Harmony Volunteer Fire Company v. Pennsylvania Human Relations Commission*, 459 A.2d 439, 442 (Pa. Cmwlth. 1983). In other words, an extremely important component of any employer-employee relationship is the employer's "right to direct the work to be done and the manner in which the work is done." *Sweet*, 322 A.2d at 365.

In *Kelley v. Delaware, Lackawanna & Western Railroad Co.*, 113 A. 419 (Pa. 1921), the employer entered into a contract with a mine worker, which provided that "[t]he work was to be carried on under the supervision and according to the direction of the manager or his duly authorized agent," *id.* at 420, and the mine foreman was the designated agent of the manager. Our Supreme Court concluded that, through the manager and/or the mine foreman, the employer actually exercised the right to direct and control the specific details of the work project and that the manager had the power to discharge an employee. As the Supreme Court concluded:

> Recurring to the contract, we ascertain that it provides [that] the mine foreman shall have control of the work, and the [mine worker] shall be subject to his orders and directions . . . . with the right to remove from the work any workmen who in the opinion of its manager are incompetent, careless, or for any other reason unsatisfactory, and that the interpretation of the contract with reference to the work shall be by the manager whose decision shall be conclusive . . . . It is therefore manifest that through the manager and mine foreman full control over the means and manner of performance was reserved to [the employer], and there was left in the [mine worker] no independence whatever in manner and means of performance. This leads to the inevitable conclusion that the relation of the [mine worker] to the [employer] was that of employee . . . .

*Id.*

Here, the Board found that the Fire Department is run, on a practical basis, by two Borough employees: the Fire Chief and the Borough Secretary. In particular, the Borough Secretary runs the day-to-day operations, and, among other things, schedules firefighters on a monthly calendar and assigns them to specific shifts. The Fire Chief administers the rules and regulations, is in charge and directs the movements of the firefighters at a fire, and gives directives to the individual firefighters in their daily operations when they are not attending to a fire. In addition,

11

the Fire Chief possesses the power to discipline the firefighters, including the authority to terminate them, while the Borough Manager has the authority to discipline the firefighters for violating the Borough policies. (F.F. at Nos. at 13, 21-22, 26, 30.) Notably, for any shift on which a firefighter is scheduled, the firefighter must remain at the Fire Department or otherwise engage in activities related to his or her duties, and is not free to leave the Fire Department to run personal errands or engage in personal matters. (F.F. at 14.) *Cf. Mendel v. City of Gibraltar*, 842 F. Supp. 2d 1035, 1042 (E.D. Mich. 2012), *rev'd on other grounds by* 727 F. 3d 565 (6th Cir. 2013) ("Lack of control is illustrated by this undisputed fact: the firefighters are not required to report when the City calls them to respond to a fire emergency."); *Wolverton v. City of Kenner*, 225 So. 2d 662, 663 (La. Ct. App. 4th Cir. 1969) ("Indeed the evidence is unrebutted that the individual volunteer is at liberty to go or not to go to any particular fire as he alone sees fit, making it plain that not even the Volunteer Company controls him.").

The Borough did not take exception to any of the above findings of fact either and, hence, they too are binding and conclusive for purposes of this appeal. *See* 34 Pa. Code §95.98(a)(3).

These findings, in turn, render the circumstances of this case akin to those in *Kelley*. Therefore, in accordance with *Kelley*, we conclude the Borough, acting through the Borough Secretary and the Fire Chief, actually directs and controls the details of the firefighters' work and has the power to discipline and discharge the firefighters if necessary. Significantly, it is undisputed that the Borough Secretary and the Fire Chief advance the interests of the Borough in managing and directing the firefighters in terms of their working schedules, job duties, and discipline, and both the Borough Secretary and Fire Chief are statutorily designated – or are on the same

12

level – as the Borough in its capacity of "employer." *See* Section 3(c) of Act 111, 43 P.S. §217.3(c) ("The term 'employer' includes any person acting, directly or indirectly, in the interest of an employer . . ."); *see also Lancaster County v. Pennsylvania Labor Relations Board*, 124 A.3d 1269, 1287 (Pa. 2015) (interpreting similar statutory provision in PERA and concluding that supervisors were the "employer" because the supervisors were "individual[s] having authority in the interests of the employer to hire, transfer, suspend, layoff, recall, promote, discharge, assign, reward or discipline other employes" or "to a substantial degree effectively recommend such action . . . .") (citation omitted).

The Borough contends, though, that the Board's Finding of Fact No. 21, insofar as it stated that "the final say on discipline rests with the Borough," *id.*, is not supported by substantial evidence.

Under Pennsylvania law, it is within the province of the Board, as the factfinder, to weigh conflicting evidence, make appropriate credibility determinations, resolve primary issues of fact, and draw reasonable inferences from the established facts and circumstances. *Lehighton Area School District v. Pennsylvania Labor Relations Board*, 682 A.2d 439, 442 (Pa. Cmwlth. 1996). Findings of fact are conclusive on appeal as long as the record contains substantial evidence to support those findings. *Uniontown Area School District v. Pennsylvania Labor Relations Board*, 747 A.2d 1271, 1274 (Pa. Cmwlth. 2000).

"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Delaware County Lodge No. 27, Fraternal Order of Police v. Pennsylvania Labor Relations Board*, 694 A.2d 1142, 1145 n.5 (Pa. Cmwlth. 1997). Stated differently, "[s]ubstantial evidence is more than a mere scintilla and must do more than create a suspicion of the existence of the fact

13

to be established." *Shive v. Bellefonte Area Board of School Directors*, 317 A.2d 311, 313 (Pa. Cmwlth. 1974).

In performing a substantial evidence analysis, this Court must view the evidence in the light most favorable to the party who prevailed before the factfinder and draw all reasonable inferences which are deducible from the evidence in favor of the prevailing party. *See Waldameer Park, Inc. v. Workers' Compensation Appeal Board (Morrison)*, 819 A.2d 164, 168 (Pa. Cmwlth. 2003); *Tapco, Inc. v. Unemployment Compensation Board of Review*, 650 A.2d 1106, 1108-09 (Pa. Cmwlth. 1994). Furthermore, in a substantial evidence analysis where both parties present evidence, it does not matter that there is evidence in the record which supports a factual finding contrary to that made by the factfinder. Rather, the pertinent inquiry is whether there is any evidence which supports the factual finding actually made. *See Waldameer Park*, 819 A.2d at 168; *Tapco, Inc.*, 650 A.2d at 1108-09.

At the hearing, the Borough Secretary testified that if a disciplined firefighter has "a major problem[,] [he or she] can go above the department head, the [F]ire [C]hief, and go to the Borough," specifically the Borough Manager. (Notes of Testimony (N.T., 1/9/14, at 325-26.) In one instance, a termination letter specifically advised a discharged firefighter to contact the Borough Manager with any questions, and the Borough Manager attended the termination meeting. (*Id.* at 306, 325.) The Borough Secretary further testified that a disciplined firefighter's final recourse is to appeal to the Borough Manager. (*Id.* at 326.) While it is true that the Borough Secretary was unaware of specific instances in which the Borough Manager had overruled the Fire Chief, she testified that the Borough Manager can overrule the Fire Chief's disciplinary decisions. (*Id.* at 326-27.) Furthermore, the Borough Manager

testified that if a member of the Fire Department does not adhere to the Borough's policies, the Borough Manager has "the power as a member to discipline anyone. It's [his] function [to discipline] those violating policies in" the Fire Department. (*Id.* at 199.)

Viewing this evidence in the light most favorable to the Fire Department,[6] we conclude that the record contains substantial evidence to support the Board's finding that the Borough Manager, a high-ranking supervisory agent who acts on behalf of the Borough Council, has the ultimate authority on disciplinary matters. *See* 43 P.S. §217.3(c) ("The term 'employer' includes any person acting, directly or indirectly, in the interest of an employer . . ."); Section 1141 of the Borough Code,[7] 8 Pa.C.S. §1141 (stating that "[t]he council of a borough may, at its discretion at any time, create by ordinance the office of borough manager" and that

---

[6] Although the Borough Secretary stated that she "believed" and "guessed" that the Borough Manager could overrule the Fire Chief, (N.T at 326-27), a fair contextual reading of her testimony, particularly the Borough Manager's affirmation that she "would say yes" to the above proposition, reveals that her statements were positive assertions of truth and were not "so uncertain, inadequate, equivocal, ambiguous, or contradictory as to make findings or legitimate inferences therefrom a mere conjecture." *Mrahunec v. Fausti*, 121 A.2d 878, 880 (Pa. 1956). *See* N.T. at 328 ("Q. And if [the firefighter] didn't like the decision of the Fire Board, he could then go to the Borough manager? A. I would say yes."); *Somerset Welding and Steel v. Workmen's Compensation Appeal Board (Lee)*, 650 A.2d 114, 117-18 (Pa. Cmwlth. 1994) (stating that "[t]he rationalization of a witness'[s] testimony and the acceptance of those portions thereof on which to make findings . . . is the province of the [fact-finder]" and reiterating that "[t]he appearance of inconsistencies in . . . testimony does not render that testimony equivocal."); *see also Inservco Insurance Services v. Workers' Compensation Appeal Board (Purefoey)*, 902 A.2d 574, 579 (Pa. Cmwlth. 2006) (reviewing testimony, "I would say that I cannot say that he's completely [recovered]" and concluding that "[t]his testimony, while admittedly not a model of clarity, is not equivocal."); *Czankner v. Sky Top Lodge, Inc.*, 308 A.2d 911, 915 (Pa. Cmwlth. 1973) (concluding that testimony, "I would say that the exact cause of death was due to a pulmonary embolism," was unequivocal evidence).

[7] 8 Pa.C.S. §§101-3501.

"[t]he borough manager shall serve at the pleasure of council . . . ."); *see also Lancaster County*, 124 A.3d at 1287. Although the record indicates that the Borough Manager has not yet exercised this authority, and it is conceivable that he never will, the key inquiry in determining whether an employment relationship exists is whether the putative employer has "the *right* and *power* to exercise . . . control, not . . . whether the right and power were *actually* exercised . . . ." *Coleman*, 383 A.2d at 1279. Therefore, we conclude that the Board did not err in determining that the Borough, acting through the Borough Manager, retained the right to discipline or terminate a firefighter irrespective if any discipline imposed by the Borough Secretary or Fire Chief.

The Borough also contends that the firefighters cannot be employees of the Borough because the Borough Council uses the term "appoint," rather than "hire," when voting to approve the Fire Chief's recommendation for a firefighter. The Borough asserts that the record lacks substantial evidence to establish that the Borough Council in fact "hires" the firefighters.

We disagree. The Borough's argument is largely one of semantics and, based on the current record, there is no meaningful legal distinction between the Borough Council's "appointment" or "hire" of a firefighter. As the Board explained:

> It is undisputed that the [Fire] Chief, a Borough employee, makes a recommendation to the Borough Council for the "appointment" of a person as a firefighter in the Fire Department. Indeed, the mere fact that the [Fire] Chief must seek Council's appointment of a firefighter implies that the Borough may deny the appointment. Thus, it is the Borough Council, not the [Fire] Chief or Fire Department, which ultimately decides whether a person becomes a firefighter in the Borough . . . . The Borough Council's "appointment" of a firefighter carries with it the understanding that the firefighter will perform services for the Borough within the Fire Department, including fire

16

> suppression and maintenance of Borough property, and in exchange for those services the firefighter will receive from the Borough an hourly wage. Indeed it is the same relationship created when the Borough indisputably "hires" a person for an hourly wage in the Borough office, streets department, police department, or anywhere else within the Borough.

(Board's Decision at 7.)

Given this logical and reasonable inference, to which the Fire Department is entitled as the prevailing party, we conclude that the record contains substantial evidence that supports the Board's determination that the Borough Council has the authority to hire firefighters and indeed hires the firefighters as a matter of law.

Accordingly, having determined that the Borough pays the firefighters hourly wages, exercises control over the firefighters' wages, hours, and working conditions, directs and controls the details of the firefighters' work, possesses the authority (or retains the authority) to discipline and/or discharge the firefighters, and has the power to hire the firefighters, we conclude that the Board did not err in concluding that the relationship between the Borough and the firefighters in the Fire Department was that of employer and employee. *See Sweet*, 322 A.2d at 365 ("The relation between employer and employe exists when a party has the right to select the employe, the power to discharge him, and right to direct both the work to be done and the manner in which such work shall be done.").

The Borough's remaining arguments lack merit. The Borough contends that it "never took any legislative action evidencing an intent to provide fire protection services through a professional fire department consisting of Borough employees." (Borough's brief at 29.) To the contrary, the Ordinance and the

17

Borough's conduct, as described and detailed above, prove that the Borough took action sufficient to create an employment relationship.

The Borough further asserts that the firefighters are equitably estopped from arguing that they are not volunteers because they have belonged to volunteer firefighting organizations and received certain benefits. More specifically, the Borough maintains that the firefighters' participation in the Emmaus Fireman's Relief Association (EFRA) and the Foreign Fire Insurance Tax Distribution Law (FFITDL),[8] providing for pension benefits, bar the firefighters from claiming that they are employees.

The Board correctly dismissed this argument as follows:

> With regard to the Borough's claims of estoppel, the Hearing Examiner rejected those claims noting that the volunteer benefits under the [EFRA] were also available to employees, and thus could not estop the firefighter from asserting employee status. Furthermore, the Hearing Examiner rejected the Borough's argument that the firefighters should be estopped from asserting employee status because the Fire Department received state funding under the [FFITDL], where it was the Borough, not the firefighters, who had repeatedly certified to the state that the firefighters were volunteers in order to obtain the state funding. Nevertheless, we note as held by the Hearing Examiner, citing to *Borough of Whitaker*, 14 PBER §14273 (Final Order, 1983), that "[i]t is well settled that the status of alleged employees under other statutory provisions, such as the Civil Service Act . . . or [FFITDL] is not dispositive of their coverage under Act 111." [citation omitted.]
>
> Similarly, the Borough's claims that the Hearing Examiner's order directs the Borough to employ firefighters in violation of other laws, such as civil service, veteran's preference or any number of other employment statutes is

---

[8] Act of December 18, 1984, P.L. 1005, 53 P.S. §§895.701—895.707.

18

> without foundation in law or fact. Notably, the Borough has not pointed to a single firefighter whose appointment violated any laws of the Commonwealth or United States. The crux of the matter here is that because firefighters were appointed by the Borough to provide services for an hourly wage, the Borough hired them as employees under the PLRA and Act 111. If laws were violated by the Borough's appointment of a firefighter, it was not caused by the Board's decision in this case.

(Board's decision at 11-12.)

We agree with the Board's analysis and adopt it as our own. In addition, we point out that "[i]n the absence of expressly proved fraud, there can be no estoppel based on the acts or conduct of the party sought to be estopped" and "an estoppel cannot be created by representations or opinions concerning matters of law." *Wilson v. Transport Insurance Co.*, 889 A.2d 563, 575 (Pa. Super. 2005). Here, there is no proof, or even suggestion, that the firefighters engaged in fraudulent conduct and the issue of whether one is an "employee" and/or "employer" under Act 111 is a conclusion of law upon which estoppel does not apply.

The Borough's reliance on *Tyrone Fire Patrol Company, No. 1 v. Tyrone Borough*, 92 A.3d 79 (Pa. Cmwlth. 2014), is misplaced. First and foremost, *Tyrone* involved an entirely different legal issue than the one at bar; namely, whether the volunteer fire police members had a contractual or continued expectation in employment for purposes of due process, which we concluded that they did not. *Id.* at 90. Second, in reaching our decision in *Tyrone*, we briefly noted that the volunteer fire police members were not paid wages and, as a result, were not employees. *Id.* at 91; *see also id.* at 92 n.14 (noting that the fire police members were "not paid employees that have a statutory right to a continued expectation of employment"). Unlike *Tyrone*, the firefighters in this case are paid hourly wages in exchange for their services, and the Borough controls the amount and payment of such wages.

19

While the payment of wages alone is not dispositive of an employment relationship, *see Sweet*, 322 A.2d at 365, when viewed together with the other credible evidence of record in this case – evidence that was lacking in *Tyrone* – the Board's conclusion in that the firefighters are employees of the Borough under Act 111 rests upon additional evidence and facts that were not present in *Tyrone*. Because we have concluded that the Board did not err in determining that the firefighters in the Fire Department are employees of the Borough, and not volunteers, our decision in *Tyrone* is readily distinguishable and has no bearing on this case.

Finally, the Borough has submitted applications for post-argument communications, citing the Supreme Court's decision in *Philadelphia Firefighters' Union, Local 22, International Association of Firefighters, AFL-CIO v. City of Philadelphia*, 119 A.3d 296 (Pa. 2015), and the concurring statement of a Justice, joined by another Justice, in *Chambersburg Borough v. Pennsylvania Labor Relations Board*, 139 A.3d 189 (Pa. 2016) (Dougherty, J., concurring from the dismissal of the appeal as improvidently granted, joined by Donohue, J.). Although this Court grants the Borough's applications, these cases are not beneficial to the Borough's position.

In *Philadelphia Firefighters' Union, Local 22*, the only issue that the Supreme Court addressed was whether the City of Philadelphia had a duty to immediately fill vacancies for the positions of fire captain and fire lieutenant under the language and terms of its Civil Service Regulations. The Supreme Court concluded in that case that the City of Philadelphia had no such obligation. Clearly, *Philadelphia Firefighters' Union, Local 22* has no logical connection to the issue presented in this case. Moreover, the concurring opinion in *Chambersburg Borough* from the dismissal of the appeal as being improvidently granted is non-binding

20

authority on this Court. Nonetheless, that case dealt with the employer-employee relationship in the secondary boycott context, and the concurring opinion expressed the view that a secondary boycott could not occur because the firefighters, "volunteer members, who are free to decline to provide their services for any reason or no reason, are not 'employees' under [the PLRA or PERA]." 139 A.3d at 192. Even if this Court were to prescribe precedential value to this concurring opinion, the firefighters in this case, unlike those in *Chambersburg Borough*, are employees under Act 111 and must show-up and remain at the Fire Department, engage in activities related to their employment duties, and are not free to leave the Fire Department to run personal errands or engage in personal matters. Therefore, we conclude that the decisions cited by the Borough do not provide any kind of guidance in this matter.

### Conclusion

By its own terms, Act 111 permits firefighters to unionize when they are "employees" of a municipality. The Borough references the interplay between statutes and volunteer firefighters and suggests that these statutes operate collectively to prohibit an employment relationship with the Borough under Act 111, or at least command and dictate that no "real" employment relationship exists. Although the Borough is statutorily mandated to create a fire force and provide workers' compensation insurance for volunteer firefighters, and has the statutory discretion to provide funding, pensions, and other fringe benefits, such as health insurance, to the volunteer firefighters, this Court has already held that these "peripheral contacts do not amount to any substantive authority or real control [by the township] over the economic and conditional terms of employment for the housemen at the individual volunteer fire companies." *International Association of Fire Fighters, Local 2844,*

21

*AFL-CIO, CLC*, 504 A.2d at 425. We do not disagree with this holding, and all of the mandatory "peripheral contacts" detailed in *International Association of Fire Fighters, Local 2844, AFL-CIO, CLC*, have not factored in either the Board's or this Court's decision. To the extent that any of the discretionary "peripheral contacts" have contributed to our conclusion, they possess little but palpable weight for our decision, which, in overwhelming part, has as its genesis and foundation the presence of additional factors, specifically those that directly pertain to the *Sweet* test.

It is extremely relevant to our conclusion that the statutes referenced by the Borough do not dictate that the Borough establish an employment relationship with the firefighters, nor do the statutes have the *per se* effect of creating a *de facto* employment relationship. Specifically, none of the statutes that the Borough cites place upon the Borough the affirmative obligation to pay the firefighters in the Fire Department an hourly wage, or, more importantly, to exert significant control over the work to be done by the firefighters and the manner in which it is to be done, which is the essence of the employment test that our Supreme Court created in *Sweet*.[9] Instead, the Borough, through the Ordinance and its own conduct, took the

---

[9] The Dissent raises many of the same arguments as the Borough. In addition, although not expressed in such terms, the Dissent appears to suggest that Act 111 is incompatible or in conflict with the statutory regime regarding volunteer firefighters. However, because there is a very strong presumption that a statute does not impliedly repeal another statute, *see Cedarbrook Realty, Inc. v. Nahill*, 399 A.2d 374, 383 (Pa. 1979), there has to be a point where volunteer firefighters become employees of a municipality for purposes of Act 111. True, under the pertinent statues, a municipality can help fund and provide financial assistance to a volunteer fire department, akin to that which a parent company does with an unconsolidated subsidiary. But there is a remarkable difference between the situation where a parent merely owns a subsidiary financially and the scenario where the parent intermingles its operations with the subsidiary and controls the subsidiary's operations by creating an employment relationship. Where, as here, a municipality designates the leaders of a fire department as its own high-ranking employees and those employees have the power to discipline, discharge, and control the day-to-day operations of the firefighters, the
**(Footnote continued on next page…)**

22

measures necessary to confer upon it the status of employer and create an employment relationship with the firefighters as employees. Having taken such action, and depriving the Fire Department of the freedom of true "volunteers" to conduct its own affairs when and how it sees fit, the Borough has ensured that its firefighters are under its control and will obey its commands. At the same time, however, the Borough has designated itself the firefighters' employer for purposes of Act 111.

   With all this being stated, we affirm the Board's final order certifying the Association as the exclusive representative of all full-time and regular part-time firefighters of the Fire Department.


                _____

                PATRICIA A. McCULLOUGH, Judge


---

**(continued…)**

municipality effectively "merges" with the fire department for purposes of employment law and Act 111.

  Significantly, the Dissent does not reference or discuss any statute or statutory scheme that requires a municipality to exert this type of control over a volunteer fire company. Accordingly, we view Act 111 and the statutes that the Borough and the Dissent cite as capable of concurrent operation, concluding that there is no irreconcilable conflict present amongst the statutes, and, at most, that the Dissent has merely shown a general overlap of the statutes in terms of basic subject matter. *See Cedarbrook Realty, Inc.,* 399 A.2d at 383 ("In view of the presumption against implied repeal, it is authoritatively stated that this presumption may be overcome by a showing that two acts are irreconcilable, clearly repugnant as to vital matters to which they relate and so inconsistent that the two cannot have concurrent operation . . . . Appellant has shown that the two statutory schemes are different and may be overlapping. Such a showing does not amount to irreconcilability under Pennsylvania law.").

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Borough of Emmaus,                         :
        Petitioner              :
                                :   No.  1847 C.D. 2014
        v.                       :
                                :
Pennsylvania Labor Relations              :
Board,                                    :
        Respondent              :

## _**ORDER**_

AND NOW, this 13th day of March, 2017, we hereby grant the Borough of Emmaus's applications to file post-submission communications and affirm the September 16, 2014 final order of the Pennsylvania Labor Relations Board.

_____
PATRICIA A. McCULLOUGH, Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Borough of Emmaus,          :
                 Petitioner    :
                             :
            v.              :    No. 1847 C.D. 2014
                             :    Argued:  June 8, 2016
Pennsylvania Labor Relations   :
Board,                      :
                 Respondent  :

BEFORE:    HONORABLE MARY HANNAH LEAVITT, President Judge
                 HONORABLE RENÉE COHN JUBELIRER, Judge
                 HONORABLE ROBERT SIMPSON, Judge
                 HONORABLE P. KEVIN BROBSON, Judge
                 HONORABLE PATRICIA A. McCULLOUGH, Judge
                 HONORABLE ANNE E. COVEY, Judge
                 HONORABLE MICHAEL H. WOJCIK, Judge

**DISSENTING OPINION**
**BY JUDGE COHN JUBELIRER**          **FILED:  March 13, 2017**

Respectfully, I believe that whether the volunteer firefighters of the "Emmaus Fire Department"[1] (Fire Department), a non-profit corporation, are employees of the Borough of Emmaus must be examined within the extensive statutory framework governing the relationship between municipalities and

---

[1] References to "Fire Department" in this case are to the separate non-profit corporation, incorporated as "Emmaus Fire Department," and established as a "volunteer" Fire Department, (Borough Ordinance No. 887, R.R. at 350a), and not a department of the Borough government.

volunteer firefighters in Pennsylvania.[2]  The General Assembly, by adopting the various statutes concerning volunteer firefighters, has intended to allow volunteer firefighters to exist as a distinct class of firefighters.  Harmony Volunteer Fire Co. and Relief Ass'n v. Pa. Human Relations Comm'n, 459 A.2d 439, 443 (Pa. Cmwlth. 1983).  These enactments reflect the General Assembly's recognition that volunteer fire departments are an integral part of fire protection in Pennsylvania, and that due to the extensive benefits available to them, and the municipalities' control over their activities, these firefighters occupy a unique area in the context of traditional employment relationships.  Accordingly, in order to give effect to the legislature's intent in matters involving volunteer firefighters, before a determination can be made regarding whether an employment relationship exists by using, for example, the test set forth in Sweet v. Pennsylvania Labor Relations Board, 322 A.2d 362, 365 (Pa. 1974), the facts must first be analyzed through the prism of the vast statutory framework underpinning volunteer firefighters to determine whether these facts actually signify a true employment relationship or reflect the distinct and unique statutory arrangement between volunteer firefighters and the municipalities they serve.  Unfortunately, in concluding that an employment relationship exists between the Borough and the volunteer firefighters here, such that the Association can be certified as the exclusive representative under Act 111, the Hearing Examiner, the Board, and the Majority did not consider the evidence and facts in the context of this extensive and overarching statutory framework.  When this is done, however, it is apparent to me that the Borough's

---

[2]  The Pennsylvania State Association of Boroughs and the Pennsylvania State Association of Township Supervisors also filed amicus curiae briefs in support of the Borough.

RCJ-2

actions fit within this unique statutory framework and do not create an employment relationship under Act 111. I would, therefore, reverse.

Currently an estimated 94 percent of municipalities in Pennsylvania rely on volunteer firefighters to provide fire protection services.[3] Given the integral role that volunteer firefighters play in providing fire protection services, which are critical to the safety and welfare of the public, it is not surprising that the General Assembly has enacted a myriad of statutes governing volunteer firefighter safety and the relationship between volunteer firefighters and the municipalities they serve. This Court has previously noted that "[n]umerous legislative enactments . . . interweave the functioning of the government and the fire company" and that "[o]ther statutes also recognize the intimate relationship between a volunteer fire company and governmental entities." Harmony Volunteer Fire Co. and Relief Ass'n, 459 A.2d at 443. This interweaving is exemplified by numerous statutes which provide for municipal involvement in volunteer firefighter companies through the provision of services, providing financial and administrative assistance, and levying taxes for such appropriations.[4] Several other statutes

---

[3] *November/December 2014 Newsletter*, The Center for Rural Pennsylvania: A Legislative Agency of the Pennsylvania General Assembly, http://www.rural.palegislature.us/publications_newsletter_1114.html#story3 (last visited March 8, 2017).

[4] For example, the Borough Code provides that boroughs must "ensure that fire and emergency medical services are provided within the borough *by the means and to the extent determined by the borough*, including the appropriate *financial and administrative assistance* for these services." Section 1202(56) of the Borough Code, 8 Pa. C.S. § 1202(56) (emphasis added). The Borough Code explicitly allows borough councils to fund volunteer fire companies by authorizing borough councils to levy taxes "for the purposes of making appropriations to fire companies both within and without the borough and of contracting with adjacent municipalities or volunteer fire companies in adjacent municipalities for fire protection." Section 1302(6) of the Borough Code, 8 Pa. C.S. § 1302(6). Similarly, Section 3 of what is commonly known as the

*(Continued…)*

further the legislative intent to encourage municipalities' involvement in *providing funding* for volunteer fire companies.[5] These include authorizing boroughs to secure workers' compensation insurance,[6] as well as pension contributions from the Commonwealth,[7] for volunteer firefighters. Additional statutes reflect the

---

Second Class City Code, Act of March 7, 1901, P.L. 20, gives Second Class Cities, i.e. Pittsburgh, the power "to organize a fire department, *with or without pay*." 53 P.S. § 23149.

[5] Pursuant to Section 7403 of the Emergency Management Services Code (EMS Code), "[a] city, borough or township may expend out of the public funds of the municipality an amount necessary to secure insurance or compensation for volunteer firemen killed or injured while going to, returning from or attending fires in the municipality or territory adjacent thereto." 35 Pa. C.S. § 7403.

[6] Section 1202(26)(i)(A) of the Borough Code, 8 Pa. C.S. § 1202(26)(i)(A). Accordingly, Section 601 of the Workers' Compensation Act (WC Act), Act of June 2, 1915, P.L. 736, added by Section 15 of the Act of December 5, 1974, P.L. 782, as amended, 77 P.S. § 1031, allows volunteer firefighters to obtain workers' compensation insurance from the municipality they serve.

[7] Under what is commonly known as the Volunteer Firefighters' Relief Association Act (VFRAA), 35 Pa. C.S. §§ 7411-7419, municipalities are encouraged to provide funds to volunteer firefighters' relief associations so that volunteer firefighters may receive certain benefits and protections. A "Volunteer firefighters' relief association" is defined as:

> An organization formed primarily to afford financial protection to volunteer firefighters against the consequences of misfortune suffered as a result of their participation in the fire service. The organization may contain within its membership the members of one or more fire companies and may serve secondary purposes, as set forth in this subchapter, but only if adequate provisions have been first made to serve the primary purpose.

35 Pa. C.S. § 7412. The purpose of the VFRAA is "to encourage individuals to take part in the fire service as volunteer firefighters by establishing criteria and standards for orderly administration and conduct of affairs of firefighters' relief associations to ensure . . . that funds shall be available for the protection of volunteer firefighters and their heirs." Section 7413 of the VFRAA, 35 Pa. C.S. § 7413. Further, under Section 7416(f) of the VFRAA, volunteer firefighters may obtain other benefits such as life, health, disability, and rehabilitation insurance. 35 Pa. C.S. § 7416(f). Volunteer firefighters may also receive *pension contributions* from the Commonwealth pursuant to the Foreign Fire Insurance Tax Distribution Law (FFITDL), Act of December 18, 1984, P.L. 1005, 53 P.S. §§ 895.701-.707. The FFITDL allocates Commonwealth funds to municipalities in order to provide certain benefits to municipal firefighters, such as

*(Continued…)*

General Assembly's intention that municipalities play a significant role in the *operation* of volunteer fire companies in addition to allowing municipalities to utilize volunteer fire companies for fire protection and encouraging municipalities to provide funding and other benefits for volunteer firefighters. The Emergency Management Services Code (EMS Code) authorizes the Pennsylvania Emergency Management Agency (PEMA) to provide loans to volunteer fire companies for the purpose of, *inter alia*, purchasing or modernizing facilities and equipment. Section 7364 of the EMS Code, 35 Pa. C.S. § 7364. Section 7364(g) of the EMS Code envisions a role for political subdivisions, like municipalities, in the ownership of volunteer fire companies' equipment and facilities, stating that volunteer fire companies are eligible for loans "regardless of legal ownership in whole or in part by any political subdivision of any facilities or apparatus equipment used by the volunteer fire company." 35 Pa. C.S. § 7364(g). In addition, "[a]ny equipment or facilities financed [by PEMA] may be transferred to a political subdivision served by the volunteer fire company." Id. Prior to obtaining a loan from PEMA, volunteer fire companies are required to demonstrate that they have available 20 percent of the total cost of the facilities or equipment; however,

> [i]f a volunteer fire company . . . is unable to meet the 20% requirement . . . then *a political subdivision which is served by the volunteer company may pledge its credit in the amount of funds necessary to satisfy the 20% requirement and, if it does so, shall cosign the application submitted by the volunteer company.*

---

pensions. Sections 703, 706 of the FFITDL, 53 P.S. §§ 895.703, 895.706. However, in order to obtain pension contributions, the governing body of a municipality must certify to the Pennsylvania Auditor General that the relief association is actually comprised of volunteer firefighters.

35 Pa. C.S. § 7364(c) (emphasis added). The Borough Code also authorizes borough councils to permit volunteer fire companies "to participate in purchase contracts for petroleum products entered into by the borough." Section 1404.1 of the Borough Code, 8 Pa. C.S. § 1404.1.

The General Assembly has further indicated that municipalities are to play a role in *volunteer firefighter training*. The EMS Code provides for the Department of Education to establish the "Pennsylvania State Firemen's Training School" (Training School) in order to provide "practical training in the control and extinguishment of fires." Section 7351 of the EMS Code, 35 Pa. C.S. § 7351. Eligibility for admission to the school is available to "[a]ll firefighters who are regularly employed by any local political subdivision . . . and all regularly enrolled members of volunteer fire companies . . . [*who are] chosen by the governing authority* of each political subdivision." Section 7354 of the EMS Code, 35 Pa. C.S. § 7354 (emphasis added). Application for admission to the Training School is made by the political subdivisions themselves. Section 7355 of the EMS Code, 35 Pa. C.S. § 7355.

Realizing that volunteer firefighters are integral to providing fire protection services in our Commonwealth, our General Assembly has also passed several statutes which allow volunteer firefighters to receive some *financial benefits* in return for their services. Although a volunteer is generally considered someone who does not receive financial compensation for the services provided, our General Assembly has expressed an intention to allow volunteer firefighters to receive some compensation without jeopardizing their volunteer status. As described above, volunteer firefighters receive workers' compensation benefits under the Workers' Compensation Act (WC Act) and certain pension and health

insurance benefits under the Volunteer Firefighters' Relief Association Act (VFRAA) and Foreign Fire Insurance Tax Distribution Law (FFITDL), even though they are considered *volunteers*.

That, pursuant to numerous statutes, volunteer firefighters may receive certain financial benefits and still retain their volunteer status reflects the tension between the traditional definition of employee, as someone who receives compensation for their services, see e.g., Seattle Opera v. National Labor Relations Board (American Guild of Musical Artists, AFL-CIO), 292 F.3d 757, 762 (D.C. Cir. 2002) (holding that an employee is one who receives financial compensation in return for his work), and the unique statutory arrangement created by the legislature to govern volunteer firefighters. Moreover, these statutes demonstrate the General Assembly's intent to permit volunteer firefighters to receive some compensation for their services, and be statutorily defined as "employees," notwithstanding the fact that they retain their status as volunteers. For example, while the definition of "employee" under Section 104 of the WC Act, is a "natural person[] who perform[s] services for another for a *valuable consideration*," 77 P.S. § 22 (emphasis added), Section 601(a)(1) of the WC Act expands the definition of employee to "include . . . members of *volunteer fire departments* or volunteer fire companies, including any paid fireman who is a member of a volunteer fire company and performs the services of a volunteer fireman during off-duty hours," 77 P.S. § 1031(a)(1) (emphasis added). See also Borough of Honesdale v. Workmen's Comp. Appeal Bd. (Martin), 659 A.2d 70, 76 (Pa. Cmwlth. 1995) (stating that, under Section 601(a)(1), volunteer firefighters are *deemed employees* of the municipality that engages them); Temple v. Milmont Fire Co., 525 A.2d 848, 849-50 (Pa. Cmwlth. 1987) (same). Another example is found

in Section 7412 of the VFRAA, which indicates that volunteer firefighters may sometimes be paid despite their volunteer status, and defines a volunteer firefighter as:

> [a] person who is a member of:
>
> (1) a fire company organized and existing under the laws of this Commonwealth;
> (2) a fire police unit, rescue squad, ambulance corps or other like organization affiliated with one or more fire companies; or
> (3) a fire company or affiliated organization which participates in the fire service *but does not look to that service as his or her primary means of livelihood*.

35 Pa. C.S. § 7412 (emphasis added). Likewise, under Section 14339 of The Third Class City Code, a volunteer firefighter is defined as "a driver of firefighting apparatus or ambulances, regularly employed and *paid* by a volunteer fire company, rendering services recognized and accepted by a city."[8] 11 Pa. C.S. § 14339 (emphasis added). Furthermore, for purposes of governmental immunity under the Judicial Code, "*[v]olunteer firefighters shall be treated as public employees*," and an "[e]mployee" is defined as "[a]ny person who is acting or who has acted on behalf of a government unit whether on a permanent or temporary basis, *whether compensated or not* and . . . *including any volunteer fireman* and any elected or appointed officer. . . ." Sections 8332.3, 8501 of the Judicial Code, 42 Pa. C.S. §§ 8332.3, 8501 (emphasis added).

When considering the evidence and facts in the context of this extensive and overarching statutory framework, it is apparent that the Borough's actions fit

---

[8] See also Section 601(a)(1) of the WC Act, 77 P.S. § 1031(a)(1) (acknowledging that, in certain instances, volunteer firefighters may receive actual payment for their services while still being considered volunteers).

within this unique statutory framework and do not create an employment relationship under Act 111.

For example, the Findings of Fact reflect, *inter alia*, that the Borough reserved the right to establish rules and regulations for the Fire Department, that the Borough owns the Fire Department building and equipment, that the Borough was responsible for repayment of a loan that the Fire Department obtained from PEMA, that the Borough pays for all of the Fire Department's expenses directly, that the Fire Department obtains fuel from the Borough garage at no cost, that the Borough's budget includes 38 line items for the Fire Department, and that the Borough established a fire services tax to raise money for the Fire Department. (FOF ¶¶ 7-12.) The Borough did not file exceptions to these Findings of Fact, instead arguing that the Board misconstrued their importance. I agree with the Borough that these findings are not dispositive because the various transactions described are all expressly allowed under the above-referenced statutes or naturally follow from the Borough's statutory rights or obligations thereunder. For instance, Section 7364(g) of the EMS Code explicitly allows boroughs to own *volunteer* fire company equipment and facilities. 35 Pa. C.S. § 7364(g). Section 7364(c) of the EMS Code expressly authorizes boroughs to *cosign for loans* made to volunteer fire departments and, consequently, become responsible for a volunteer fire company's loan. 35 Pa. C.S. § 7364(c). Section 1302(6) of the Borough Code permits boroughs to *levy taxes* in order to make appropriations to volunteer fire companies; thus, it naturally follows that a borough would establish a specific fire services tax to raise money for a fire company. 8 Pa. C.S. § 1302(6). Further, because the Borough is statutorily permitted to own the Fire Department's

equipment and facilities, it is reasonable for it to fund the Fire Department and to exercise significant control over the Fire Department's budget.

Moreover, the Borough's obligations and potential liability under the WC Act for the volunteer firefighters, as described above, provide ample explanation for many of the Borough's actions. These actions include: establishing rules and regulations for the Fire Department; issuing employee personnel policies, such as the drug and alcohol policy and Non-Union Employees Light Duty Policy, which the Borough was required to do by its workers' compensation carrier, (FOF ¶¶ 23-24; Hr'g Tr. at 151, R.R. at 162a); and controlling the Fire Department's budget and staffing, including requiring background checks and having the volunteer firefighters clock in and out, (FOF ¶¶ 11, 14, 26). Maintaining a drug and alcohol free workplace and ensuring that the Fire Department is properly staffed with individuals who pass background checks makes sense in the context of the Borough's workers' compensation obligations. Likewise, because the Borough is *required* to pay workers' compensation for the volunteer firefighters, it is logical for the Borough to retain some control over the Fire Department's rules and regulations in order to minimize injuries to firefighters for which it may be liable. Consequently, when these Findings of Fact, which were relied upon by the Board to conclude that the Borough exercised control over the working conditions, are analyzed within the specific statutory framework applying to voluntary firefighters, their legal significance under Act 111 is lost.

Similarly, several other of the Findings of Fact related to the Borough's control over firefighter selection and disciplinary matters lose their legal significance when evaluated in terms of the evidence and the Borough's statutory obligations. Regarding hiring, the Fire Chief initially selects the volunteer

RCJ-10

firefighters, and the Borough Council appoints firefighters to the Fire Department based on the Fire Chief's recommendations; however, there is no evidence that the Borough Council ever rejected one of the Fire Chief's recommendations. (FOF ¶ 20; Board Final Order at 7.) Although the Borough is involved in an aspect of the selection process, given the Borough's statutory liability for volunteer firefighters' workers' compensation and other volunteer firefighter benefits, the volunteers' use of the Borough's equipment and facilities, and the Borough's statutory role regarding the volunteer firefighters' attendance at the Training School, it is prudent for the Borough to exercise a modicum of control over the selection of volunteer firefighters. Moreover, because of the Borough's statutory responsibility under Section 1202(56) of the Borough Code to provide firefighting services in a safe and effective manner within the Borough and to reduce any risk to the public in the provision of such firefighting services, 8 Pa. C.S. § 1202(56), the Borough has an obligation to ensure that the volunteer firefighters selected to serve are reliable, trustworthy, and properly trained to use the Borough's equipment.

Further, with respect to the Borough's control over disciplinary matters, I disagree with the Majority that there was substantial evidence to support the finding that the Borough has the final say over disciplinary matters.[9] Although the

---

[9] The Board found that although the Fire Chief handles disciplinary matters, "the final say on discipline rests with the Borough" because a firefighter that is unhappy with a disciplinary action "may appeal the decision to the Borough Manager." (FOF ¶ 21.) Although when the Fire Chief terminated one of the volunteer firefighters he sent a letter to the terminated firefighter informing him that he could *contact* the Borough Manager with questions, (Borough's Ex. 37, R.R. at 557a), there is not substantial evidence in the record that *the final say* on discipline rests with the Borough or that disciplined firefighters could appeal to the Borough Manager. The Board's finding was based, in part, on the following cross-examination testimony of the Borough Secretary regarding the termination letter sent by the Fire Chief:
Q. Okay. Okay. The letter that you were shown, R-37, . . .
A. Yes.

*(Continued…)*

RCJ-11

Borough Manager does have the authority to discipline volunteer firefighters who violate the *Borough's policies*, (FOF ¶ 20), the Board's finding that the Borough has the *final* say because a firefighter that is unhappy with the Fire Chief's decision can "appeal" to the Borough Manager is based on testimony that I believe is

> Q. . . . the last paragraph, it says if you have any questions, please feel free to contact either the Borough manger [sic] or myself.
> A. Yes.
> Q: Why would the Borough manager be included in that letter?
> A. Because I believe if they have a major problem they can go above the department head, the fire chief, and go to the Borough.
>           . . .
> A. If they don't' like that, their final recourse would be going to the Borough to find out, you know, why they can't . . . get a response . . .
> Q. And can the Borough manager overrule the fire chief?
> A. I never have had that problem.
> Q. Well, if he couldn't, why would he be in this letter?
> A. I guess he would be able to.

(Hr'g Tr. at 325-27, R.R. at 336a-38a.) The Borough Secretary also testified about another firefighter that was disciplined:

> Q. . . . do you know if [the firefighter] appealed to the Borough manager his discipline?
> A. No, I don't believe he did.
> . . .
> Q. Did he have the right to?
> A. I don't know. I'm not sure. His next step would have been to go back to the Fire Board.
> . . .
> Q. And if [the firefighter] didn't like the decision of the Fire Board, he could then go to the Borough manager?
> A. I would say yes.

(Hr'g Tr. at 327, R.R. at 338a.)

When the Borough Secretary was asked whether a firefighter could appeal an adverse disciplinary decision to the Borough Manager, she stated that she *believed* that a firefighter who disagreed with a disciplinary determination could go to the Borough and that, although it did not ever happen, when pressed for an answer, she *guessed* that the Borough Manager would be able to overrule the Fire Chief. Moreover, when asked about whether another firefighter could have appealed to the Borough Manager, after saying she did not know and was not sure, after being pressed she finally stated, "I *would say* yes." (Hr'g Tr. at 327, R.R. at 338a (emphasis added).)

RCJ-12

inadequate to allow a "reasonable mind [to] accept [it] as adequate to support [that] conclusion." Delaware Cnty. Lodge No. 27, Fraternal Order of Police v. Pa. Labor Relations Bd., 694 A.2d 1142, 1145 n.5 (Pa. Cmwlth. 1997). I would not conclude that the fact that an unhappy firefighter could "contact" the Borough Manager with questions is the equivalent of the right to appeal. Moreover, the Borough Secretary's testimony that she "*did not know*" or "*believed*" or "*guessed*" that a firefighter could "appeal" to the Borough Manager was equivocal[10] and, therefore, does not constitute substantial evidence to support the finding that the Borough had the final say over disciplinary matters. See Subdivision Servs. Corp. v. Zoning Hearing Bd. of Charlestown Twp., 784 A.2d 850, 852 (Pa. Cmwlth. 2001) (stating that "equivocal testimony can[not] be deemed substantial so as to justify the [factfinder's] reliance thereon . . . ."); Feinberg v. Unemployment Comp. Bd. of Review, 635 A.2d 682, 686 (Pa. Cmwlth. 1993) (equating "testimony which is so uncertain or inadequate" with being "equivocal" and stating that "[w]here testimony is so inadequate or contradictory[, i.e. equivocal] that . . . findings of fact based upon it become mere conjecture, it fails to meet the test of substantiality").

As argued by the Borough, because it has a statutory obligation to provide workers' compensation for the firefighters and is statutorily authorized to own the Fire Department buildings and equipment, the Borough's ability to enforce some of its policies in the Fire Department is not dispositive of the existence of an employment relationship. Similarly, the Borough's *obligation* to provide firefighter services to the public in a safe and effective manner means that the

---

[10] Equivocal testimony is that which is vague and leaves doubt as to its meaning. Chadwick v. Workmen's Comp. Appeal Bd. (Benjamin Franklin Hotel), 573 A.2d 652, 655-56 (Pa. Cmwlth. 1990).

Borough has a responsibility to ensure that firefighters do not violate Borough personnel policies related to public safety, such as the drug and alcohol policy.

Finally, my conclusion that no employment relationship exists in this matter finds additional support in the recent case of Tyrone Fire Patrol Company No. 1 v. Tyrone Borough, 92 A.3d 79 (Pa. Cmwlth.), petition for allowance of appeal denied, 105 A.3d 739 (Pa. 2014), cert. denied, __ U.S. __, 135 S. Ct. 1749 (2015). In Tyrone Fire Patrol, three members of the Tyrone Fire Police Association were terminated by the Tyrone Borough Council. Tyrone Fire Patrol, 92 A.3d at 86. The three Fire Police members filed an action against the borough contending that the borough had violated their due process rights by removing them without a notice and a hearing. Id. This Court determined that they would only have a right to a hearing if they could establish that their dismissal affected "a statutory or contractual right of continued employment." Id. at 91. We applied the Sweet test to determine whether an employment relationship existed, noting that, although "Fire Police members [were] confirmed by the Borough Council, serve[d] at the pleasure of the Borough Council, and [could] be removed at any time for any reason by the Borough Council, the Fire Companies, and not the Borough Council, [had] the authority to nominate potential Fire Police members." Id. We further determined that fire police members could not serve if they were not in good standing with the fire companies, a determination made solely by the fire companies and not the borough. Id. Thus, we concluded an employment relationship did not exist between the members and the borough council. Id.

The facts of the instant case are remarkably similar to Tyrone Fire Patrol. Like Tyrone Fire Patrol, although the Borough Council here confirms firefighters, it is the Fire Chief, rather than the Borough, who actually selects the firefighters.

Moreover, similar to Tyrone Fire Patrol where the Fire Police members had to be in good standing with their fire companies in order to serve, which was determined solely by the fire companies, it is the Fire Chief, instead of the Borough, who exercises most control over disciplinary matters in the instant matter. Thus, Tyrone Fire Patrol provides additional support that there is not an employment relationship between the Borough and firefighters.

The Majority would find that Tyrone Fire Patrol is inapposite because, it involved a different legal question and, unlike here, there was no evidence that the firefighters were paid an hourly wage. While Tyrone Fire Patrol did involve a different legal question, whether the volunteer firefighters had a contractual or continued expectation to employment so as to render a decision to remove them an appealable adjudication, that matter also involved, as here, an inquiry into the employment relationship between volunteer firefighters and the borough that they served. Moreover, although Tyrone Fire Patrol states that the individuals were not paid employees, it does so based on its observation that the borough's ordinance at issue authorized the borough to, *in its discretion*, pay those volunteer firefighters for their services as members of the fire police. Id. at 92 n.14. I note that, other than this reference, there is nothing in the recitation of the facts in Tyrone Fire Patrol that states these individuals were *not* paid for their services as the borough was authorized to do under its own ordinance. Finally, it is well-established that "[t]he duty to pay an employe's salary is often coincident with the status of employer, *but not solely determinative of that status*." Sweet, 322 A.2d at 365 (emphasis added). Further, several of the statutes involving volunteer firefighters discussed *infra* plainly allow volunteer firefighters to receive compensation and benefits without losing their volunteer status. Thus, it is consistent with precedent

RCJ-15

and the established statutory framework to conclude that payment of an hourly wage by the Borough to the volunteer firefighters, in and of itself, is not dispositive of an employment relationship.

For these reasons, I respectfully dissent from the Majority and would hold that the Board erred in concluding that an employment relationship exists between the Borough and the volunteer firefighters.[11]

_____

**RENÉE COHN JUBELIRER**, Judge

Judges Simpson and Covey join in this dissenting opinion.

---

[11] In response to footnote 9 of the Majority opinion, the Dissent is not suggesting that Act 111 is incompatible or in conflict with the statutory scheme regarding volunteer firefighters and, therefore, is repealed as to volunteer firefighters. Rather, given the numerous statutes enacted to allow municipalities to provide aid and assistance, such as financial assistance, pension and workers' compensation benefits, equipment, and training, to the volunteer firefighters that serve that community, volunteer firefighters occupy a unique area in the context of traditional employment relationships. Thus, when determining whether an employment relationship under Act 111 exists in volunteer firefighter cases, by using, for example, the test set forth in Sweet, the Dissent simply would require the facts to be analyzed in light of this vast statutory framework to determine whether they signify a *true* employment relationship for the purposes of Act 111. Facts that might suggest an employment relationship in other employment situations may not necessarily (and here do not) signify the intent to create such relationship between the volunteer firefighters and the municipality they serve, but could be the result of the municipality providing the assistance and aid permitted by these various laws. In other words, there has to be a determination whether the municipality's actions intended to create an employment relationship or were simply intended to provide aid and assistance as approved by the statutory framework. Moreover, the Majority reiterates its position that the Borough exercises control over, *inter alia*, the discipline and discharge of the volunteer firefighters resulting in the merger of the municipality and the volunteer fire department for the purposes of Act 111 and employment law. However, as discussed, the Dissent would conclude that these findings are not supported by substantial evidence, but are based on testimony that is equivocal.